UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-07-86-B-W |
| | ) | |
| BONNY L. REYNOLDS, | ) | |
|   A/K/A Bonny Hutchins, Bonny House, | ) | |
|   and Bonny Buzzell | ) | |

### ORDER ON MOTION TO SUPPRESS

Charged with illegal possession of two firearms, Bonny L. Reynolds moves to suppress the firearms, which a police officer found in her bedroom, and the results of a subsequent forensic test. She argues that the search and subsequent testing should have been conducted pursuant to a warrant. The Government insists Ms. Reynolds consented to the search and there is no reason to suppress either the firearms or the test results. The Court denies Ms. Reynolds' motion to suppress.

## I.    STATEMENT OF FACTS

### A.    The Indictment and Motion to Suppress

On December 11, 2007, a grand jury indicted Ms. Reynolds for (1) knowingly possessing two .22 caliber revolvers after having been committed to a mental institution, an alleged violation of 18 U.S.C. § 922(g)(4); and, because the serial number on one of the revolvers was obliterated, (2) knowingly possessing a firearm with an obliterated serial number, an alleged violation of 18 U.S.C. § 922(k). *Indictment* (Docket # 3). On March 12, 2008, Ms. Reynolds filed the motion to suppress, *Def.'s Mot. to Suppress* (Docket # 26) (*Def.'s Mot.*); the Government filed its opposition on April 2, 2008, *Gov't's Resp. to Def.'s Mot. to Suppress*

*Evidence* (Docket # 31) (*Gov't's Resp.*); and, the Court held an evidentiary hearing on March 24, 2009.[1]  *Minute Entry* (Docket # 63).

### B.      The Suppression Hearing:  Testimony of Officer Scott P.H. Harris

The only witness at the suppression hearing was Scott Harris, who has been a patrol officer with the Augusta Police Department for ten years.  Officer Harris testified that on May 2, 2006 at 11:00 a.m., he and another officer reported to a single-wide mobile home in response to a call from a Mr. Bradford.  As they proceeded, the officers knew only that Mr. Bradford had complained that there was a woman in his residence whom he wanted to leave.  Upon arrival, Officer Harris and the other patrol officer, who were both in uniform and in marked patrol cars, encountered Mr. Bradford outside the mobile home.  Mr. Bradford reiterated his complaint and, according to Officer Harris, said that he had "had enough" of the woman in his residence.

Before entering the mobile home, Officer Harris asked Mr. Bradford to clarify his and the unwanted woman's living arrangement.  Mr. Bradford explained that the unwanted woman, Bonny Reynolds,[2] initially had been invited to stay in the mobile home and keep another woman, Roxanna Reynolds, company while Mr. Bradford was incarcerated.  After Mr. Bradford returned home, Ms. Reynolds was allowed to remain on the condition that she pay rent.  Mr. Bradford,

---

[1] The delay merits explanation.  After her February 19, 2008 arraignment, Ms. Reynolds was released on an unsecured bond with conditions.  *Minute Entry* (Docket # 13).  Based on allegations that she violated the conditions of her release, Ms. Reynolds was arrested on February 27, 2008, and United States Magistrate Judge Kravchuk released her the next day on amended conditions.  *Am. Order Setting Conditions of Release* (Docket # 22).  Ms. Reynolds filed the motion to suppress, which the Court referred to Judge Kravchuk, who immediately noticed a motion hearing for April 29, 2008.  *Notice of Hr'g on Mot.* (Docket # 33).  Ms. Reynolds failed to appear, was arrested the next day, and was ultimately detained.  *Order of Revocation and Detention Pending Trial* (Docket # 40).  Ms. Reynolds' apparent inability to comply with conditions of release and to appear as required led the Government to move for a hearing to determine her competency to stand trial pursuant to 18 U.S.C. § 4241(a).  *Gov't's Mot. for Competency Hr'g and for Psychological or Psychiatric Examination of Def.* (Docket # 41).  After an evaluation and hearing pursuant to 18 U.S.C. § 4247(d), the Court found on July 30, 2008 that Ms. Reynolds was not competent to stand trial, and ordered her into the custody of the Attorney General for treatment.  *Order* (Docket # 56).  It was not until March 16, 2009 that the Court found Ms. Reynolds competent to stand trial.  *Minute Entry* (Docket # 60).  The Court quickly scheduled a hearing on both the pending motion to suppress and a newly-filed motion for release for March 24, 2009.

[2] Officer Harris referred to the Defendant, Bonny Reynolds, as Bonny Hutchins throughout his testimony.  To maintain consistency with the Indictment, the Court refers to the Defendant as Bonny Reynolds.

who was a tenant himself, said Ms. Reynolds had not been paying rent as agreed.  Officer Harris did not know how long either phase of the living arrangements had lasted, nor did he know how long Mr. Bradford had been incarcerated.  Based on this information, he thought Mr. Bradford's problem sounded more like a civil than a criminal one.  Officer Harris agreed that Ms. Reynolds was starting to sound like a tenant herself, and that, as he understood it, to remove her, a court would likely have to be involved.  Nevertheless, the officers followed Mr. Bradford into the mobile home to investigate.  Officer Harris said he was sure that before entering he would have asked Mr. Bradford for permission to do so.

Once inside, Mr. Bradford told the officers that Ms. Reynolds was in the back bedroom and that she had two unloaded guns.  Officer Harris and the other patrol officer proceeded down the hallway towards the back bedroom with guns drawn.  They checked all the rooms on their way to the back, looking under beds and behind doors.  Upon reaching the back bedroom, Officer Harris knocked on the closed door.  He heard a woman from inside the room say "come in."  The officers entered the bedroom and found Ms. Reynolds lying on her back on the bed.  Officer Harris asked her if she had any guns.  Ms. Reynolds said "yes," and pointed to the headboard behind her.  The guns were not visible.  Officer Harris walked alongside the bed towards the headboard, opened a compartment in the headboard, saw the guns, and removed them.

After securing the guns, Officer Harris asked Ms. Reynolds for identification.  Ms. Reynolds said the only identification she had was her social security card.  Officer Harris asked her name, and Ms. Reynolds gave her first name, Bonny, and three last names:  Hutchins, Reynolds, and House.  Officer Harris could not remember if he gave the guns to the other officer at this point, but he did call dispatch and check all three names.  At first, it appeared that Ms.

Reynolds may have been involved in a felony in Madison, Maine but it turned out that charge had been dropped. Officer Harris did learn, however, that Ms. Reynolds had been "blue papered" in April. Officer Harris explained that "blue papered" means that Ms. Reynolds had been kept in a hospital for psychological evaluation, and that he knew people who had been "blue papered" are prohibited from possessing guns. Based on this information, Officer Harris told Ms. Reynolds that he was keeping the guns because she was not allowed to have them. Ms. Reynolds protested, saying that she needed them because she was practicing to become a deputy sheriff. Both officers left the mobile home, taking the guns with them. By that time, Officer Harris had concluded that Ms. Reynolds' continued presence in the residence was a civil matter.

Officer Harris conceded that he had no independent recollection of these events, and that his recollection was limited to the contents of his contemporaneous written report, which he reviewed before testifying. Thus, there were several things he could not remember. He was not sure whether the lights on his patrol car were flashing when he arrived or while he was there; in all likelihood, they were not. He could not remember if he identified himself as a police officer when he knocked on Ms. Reynolds' door, but he and the other officer were in uniform, and his badge was visible. Although he remembered that both he and the other officer had drawn their guns for the walk down the hallway, he was not sure if both guns remained drawn while in Ms. Reynolds bedroom. He was unable to recall what Ms. Reynolds was wearing, though he said it was not inappropriate. Likewise, he could not say what she was doing while he was retrieving the guns from the headboard compartment, but he explained that she was free to leave the entire time, and at no time was she placed under arrest, handcuffed, or physically searched. Finally, he was unable to explain exactly what he did with the guns when he called dispatch; he thought he may have given them to the other officer.

There were also several things that Officer Harris remembered he did not do.  He never asked Ms. Reynolds for permission to look in the headboard compartment, to remove the guns, or take them with him when he left.  He never asked Mr. Bradford for permission to do these things, either.  He explained that he did not ask for permission because he was concerned with officer safety.

## II.   DISCUSSION

Ms. Reynolds argues that all evidence obtained as a result of the warrantless search of her bedroom must be suppressed at trial, because the search violated her constitutional rights.  *Def.'s Mot.* at 1.  The Government responds that Ms. Reynolds consented to the search and that her suppression arguments are therefore meritless.  *Gov't's Resp.* at 9-10.

### A.   General Principles

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST. amend. IV.   "A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property."  *Horton v. California*, 496 U.S. 128, 133 (1990); *Segura v. United States*, 468 U.S. 796, 806 (1984) (noting that the Fourth Amendment safeguards different interests).   A search occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *United States v. Samboy*, 433 F.3d 154, 161 (1st Cir. 2005).   On the other hand, a seizure of property "occurs when there is some meaningful interference with an individual's possessory interests in that property."[3]  *Jacobsen*, 466 U.S. at 113; *Tower v. Leslie-*

---

[3] Quoting *Texas v. Brown*, 460 U.S. 730, 747 (1983) (Stevens, J., concurring), the First Circuit has recognized that "'there are important differences'" between searches and seizures.  *United States v. Giannetta*, 909 F.2d 571, 578 (1st Cir. 1990).  At the same time, the First Circuit has observed that there is a "categorical interchangeability of searches and seizures in terms of [F]ourth [A]mendment analysis" and has assigned "minimal weight to the search/seizure distinction."  *United States v. Cardona*, 903 F.2d 60, 64 (1st Cir. 1990) ("[T]he span of possible searches overlaps, almost perfectly, with the span of possible seizures in the extent to which they, respectively, may or may not infringe upon [F]ourth [A]mendment interests.").

*Brown*, 326 F.3d 290, 297 (1st. Cir. 2003).   The Supreme Court recently explained that the exclusionary rule, which "forbids the use of improperly obtained evidence at trial," is a "judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'"   *Herring v. United States*, __ U.S. __, 129 S. Ct. 695, 699 (2009) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

**B.**     **Officer Harris' Warrantless Search of Ms. Reynolds' Bedroom**

**1.**     **Validity of Consensual Searches under the Fourth Amendment**

A search of a person's home "is generally not reasonable without a warrant issued on probable cause." *Maryland v. Buie*, 494 U.S. 325, 331 (1990); *United States v. Jones*, 187 F.3d 210, 219 (1st Cir. 1999) (noting the general rule that "'warrantless searches are presumptively unreasonable'" (quoting *Horton*, 496 U.S. at 133)).   The dual requirements of a warrant and probable cause, however, are subject to well-recognized exceptions; one of which, a consensual search, is a "'specifically established exception[] to the [Fourth Amendment] requirements of both a warrant and probable cause.'"   *United States v. Melendez*, 301 F.3d 27, 32 (1st Cir. 2002) (second alteration in original) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). Although consent need not be express and may be "inferred from conduct," it must be voluntary to be valid.   *United States v. Winston*, 444 F.3d 115, 121 (1st Cir. 2006) (referring to consent inferred from conduct as "implied-in-fact" consent); *United States v. McCurdy*, 480 F. Supp. 2d 380, 388 (D. Me. 2007).   "'The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search.'"   *Winston*, 444 F.3d at 121 (quoting *United States v. Miller*, 589 F.2d 1117, 1130 (1st Cir. 1978)).   These circumstances include "the interaction between the police and the person alleged to have given consent."   *United States v. Weidul*, 325 F.3d 50, 53 (1st Cir. 2003).   In addition to the

requirement that it be based on valid consent, "[a] consensual search may not exceed the scope of the consent given." *Melendez*, 301 F.3d at 32 (internal quotation omitted). The Government must prove by a preponderance of the evidence that the consent given was valid and that the search did not exceed its scope. *Winston*, 444 F.3d at 121; *Melendez*, 301 F. 3d at 32.

### 2.    Ms. Reynolds' Implied-in-fact Consent

Ms. Reynolds' first argument is that she did not consent to Officer Harris' search of the headboard behind her bed.[4] She explains that because Officer Harris did not inform her of his intention to search for firearms and seize any he found, "it is not reasonable to assume that [she] consented to [his] searching for the gun by opening the headboard compartment." *Def.'s Mot.* at 3-4. Further assuming her subjective understanding of Officer Harris' intention to search is relevant, she goes on to say "[t]here is no context in which the court could find that [she] had a notion as to what the officer's intentions were regarding the firearms."[5] *Id.* at 4. The Government contends that the search was "properly the result of voluntary consent" and was "objectively reasonable and limited to the items for which consent had been obtained." *Gov't's Resp.* at 9.

Whether Ms. Reynolds' gesture towards the headboard compartment was implied-in-fact consent to search is a close question. *Winston* is the most recent First Circuit authority on the issue. In *Winston*, the defendant was indicted for distributing cocaine and agents went to his

---

[4] Ms. Reynolds does not contest the officers' right to enter the mobile home and proceed to her door. The officers' actions to that point had been authorized by Mr. Bradford, the co-tenant. *United States v. Matlock*, 415 U.S. 164, 171 (1974); *United States v. Jimenez*, 419 F.3d 34, 40 (1st Cir. 2005). Also, Ms. Reynolds has not challenged the officers' entry into her bedroom, presumably because when they knocked on the closed door, she invited them in.

[5] The Court disagrees with Ms. Reynolds' implication that a finding of consent requires that the person consenting was aware that she was free to withhold her consent and understood the possible consequences of consenting (e.g., search, seizure, arrest, and prosecution). This implied requirement of awareness and understanding conflicts with the Supreme Court's determination in *Schneckloth* that consent to search need not be knowing and intelligent, but only freely and voluntarily given. *Schneckloth*, 412 U.S. at 246 (rejecting application of the waiver requirements of *Johnson v. Zerbst*, 304 U.S. 458 (1938), to analysis of consensual searches under Fourth Amendment); *United States v. Schaefer*, 87 F.3d 562, 569 (1st Cir. 1996); *United States v. Nelsen*, No. 05-98-P-S, 2006 U.S. Dist. LEXIS 12610, at *12 (D. Me. Mar. 22, 2006).

house to execute an arrest warrant.  444 F.3d at 116-17.  Once inside the defendant's house, the agents cuffed the defendant's hands behind his back and asked him for identification.  *Id.* at 117.  The defendant told them his identification was in the nightstand in the bedroom.  *Id.*  Unable to find the nightstand themselves, the agents brought the defendant into the bedroom and asked him again where his identification was; this time, the defendant pointed to the nightstand with his shoulder.  *Id.*  The agents opened the drawer in the nightstand and found a large amount of cash, which the defendant later moved to suppress, arguing that the search violated his Fourth Amendment rights.  *Id.*

The First Circuit observed that these facts "clearly support" the conclusion that the defendant consented to the search.  *Id.* at 121.  Cognizant that the agents' questions and the defendant's verbal and nonverbal responses had nothing to do with permission to search, the *Winston* court explained:  "While the agents did not explicitly ask for permission to open the drawer to retrieve Winston's identification, the circumstances described would reasonably lead the agents to conclude that Winston was consenting to the opening of the drawer in the nightstand to allow for the retrieval of his wallet and identification."  *Id.*  The court noted that it was not of "decisive significance" that the defendant's consent was nonverbal.  *Id.* at 122 (citing *Robbins v. MacKenzie*, 364 F.2d 45, 48 (1st Cir. 1966)).  With respect to voluntariness, the court acknowledged that an in-home arrest pursuant to a search warrant at the hands of armed agents was an "inherently coercive situation," but it did not "preclude a finding of voluntariness."  *Id.* (citing *United States v. Watson*, 423 U.S. 411, 424 (1976)).

Although *Winston* offers guidance, it does not compel a particular result.  Unlike the defendant in *Winston*, who responded nonverbally to a question about the *location* of certain property, Ms. Reynolds responded nonverbally to a question about the *existence* of certain

8

property.  Both Officer Harris and the agent in *Winston* understood these responses as consent to search for the property.  In the Court's view, Ms. Reynolds makes more out of this difference than is warranted.  At bottom, in the context of this case, the difference between existence and location of personal property is slight.   When the two police officers entered her bedroom and asked her about weapons, it is only common sense that they were going to locate and secure them.  Thus, when Ms. Reynolds voluntarily shared with Officer Harris the location of the guns, it is likely that she knew he intended to find them.  In other words, her actions belie her current argument that she had no idea he intended to search.  Moreover, without any analysis of the defendant's subjective understanding of the circumstances, the First Circuit in *Winston* had little trouble concluding that the defendant's gesture towards the nightstand with his shoulder constituted implied-in fact consent on which the agents reasonably relied when they conducted their search.  The Court concludes that Ms. Reynolds' gesture towards the headboard likewise constituted implied-in-fact consent on which Officer Harris reasonably relied when he searched for the guns.[6]

### 3.    Voluntariness

The First Circuit has instructed that voluntariness of consent is assessed by considering the totality of the circumstances:

> The court should take into account factors such as the consenting party's age, education, experience, intelligence, and knowledge of the right to withhold

---

[6] A small part of the *Winston* court's implied-in-fact consent analysis depended on the object of the search: "Favoring a finding of implied-in-fact consent in this case is the fact that a request for information about the location of [the defendant's] identification is much more benign than a request for information about the location of weapons."  *Winston*, 444 F.3d at 122.  Even though *Winston* noted that "'[i]n the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment,'" *id.* at 121 (quoting *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004)), *Winston* nowhere suggested that the agents' search of the nightstand did not constitute a Fourth Amendment search.  The Court interprets the First Circuit's reference to a question about weapons simply to mean that some questions are less benign than others.  The Court does not view this reference to suggest that where, as here, an officer seeks weapons he has at least reasonable suspicion if not probable cause to believe are in a room, a more direct and intrusive question as to their location forecloses a finding of implied-in-fact consent.

> consent.  Further considerations include whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.

*United States v. Dunbar*, 553 F.3d 48, 57 (1st Cir. 2009) (internal quotation omitted).  The Government argues that Ms. Reynolds' consent was voluntary because she is an adult and "was not detained, handcuffed or placed under arrest and the police used no overtly coercive tactics." *Gov't's Resp.* at 7.  The Government glosses over several factors the Court must consider under *Dunbar*.  First, the Government adduced no evidence of Ms. Reynolds' education, experience, intelligence, or knowledge of the right to withhold consent.  In fact, Ms. Reynolds apparently had been committed to a mental institution a month before the search, and it is reasonable to infer that her ability to understand and exercise her right to withhold consent may have been impaired at the time of the search.  Second, there is no indication that Ms. Reynolds was advised of her right to refuse her consent.  Third, on this evidence, the Court cannot conclude that it was more likely than not that the officers announced their identity as police officers or holstered their guns before they entered Ms. Reynolds' bedroom.[7]  Thus, by responding to a late-morning knock on her closed bedroom door, Ms. Reynolds found herself supine on her bed in sudden, close company with armed patrol officers.

These factors weigh in favor of involuntariness.  On the other side of the scale is *Winston*, in which the First Circuit found voluntary consent notwithstanding the fact that it was given while under arrest in an "inherently coercive situation," *Winston*, 444 F.3d at 122.  For this proposition, the First Circuit cited *United States v. Watson*, in which the Supreme Court observed that "the fact of custody alone has never been enough in itself to demonstrate a coerced

---

[7] Officer Harris could not remember whether he and his companion had holstered their weapons before entering Ms. Reynolds' bedroom.  The Court finds they likely did not.  Mr. Bradford had told them that Ms. Reynolds was in the back room with two unloaded guns.  Accordingly, both officers had drawn their guns for their investigatory trip down the hallway to her room.  It makes no sense that the officers would have holstered their weapons in advance of their encounter with Ms. Reynolds, whom they had a reason to believe was potentially armed.

10

. . . consent to search." 423 U.S. 411, 424 (1976). Here, Ms. Reynolds was not in custody. To the contrary, she was in her own bedroom. Moreover, even though the presence of police officers with drawn revolvers carries some inherent force, the Court still infers from Officer Harris' testimony and Ms. Reynolds' cooperation that the situation in the bedroom was at the less coercive spectrum of similar situations. There was no suggestion of tension, raised voices, affirmative assertions of law enforcement authority, direct coercion, or Ms. Reynolds' objection. The Court concludes that the presence of the armed officers does not by itself render Ms. Reynolds' consent involuntary.

The parties provide no guidance on how to interpret other factors that weigh against voluntariness. The fact that Ms. Reynolds was allegedly committed to a mental institution shortly before the search gives the Court pause. The Court has not been provided with any details associated with that commitment or with her history of mental illness.[8] Thus, even though the Supreme Court in *Watson* noted that an indication in the record that a consenting defendant is "mentally deficient," 423 U.S. at 425, may also weigh against voluntariness, there is no direct evidence here—only inferences that could be drawn from Ms. Reynolds' prior commitment. Further, there is no evidence from which the Court could conclude that at the time of the search Ms. Reynolds was to any extent affected by underlying mental illness.

Considering the *Dunbar* factors, the Court finds the Government has met its burden of establishing by a preponderance that Ms. Reynolds' consent was voluntary. There is no indication that she was mentally deficient, nor is there an indication that her will was overborne by overtly coercive police conduct. Although the situation may have been inherently coercive, this is not determinative; the fact that Ms. Reynolds immediately responded to Officer Harris'

---

[8] Because it presided over the her competency hearing, it has some evidence as to her mental health background, but the parties did not ask the Court to consider evidence from that hearing in resolving this suppression issue, and the Court has not done so.

question, and volunteered more information than he sought, shows that she was not coerced into doing so. *Winston*, 444 F.3d at 122.

### 4.      Scope

The First Circuit has said that "[a] search justified by consent will be deemed reasonable as long as it does not exceed the scope of the consent given." *United States v. Jones*, 523 F.3d 31, 38 (1st Cir. 2008).   To determine the scope of consent, courts apply a test of objective reasonableness—"what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *Jones*, 523 F.3d at 38.   Here, it was objectively reasonable for Officer Harris to search for guns in the compartment that Ms. Reynolds pointed to in response to his question regarding the presence of guns.

### 5.      The Consensual Search was Reasonable

Because Ms. Reynolds voluntarily consented to Officer Harris' search, and Officer Harris' search did not exceed the scope of her consent, the Court concludes that Officer Harris' search for the guns was reasonable under the Fourth Amendment.

### C.      Officer Harris' Warrantless Seizure of the Guns

A conclusion that the search was reasonable does not end the controversy.   Officer Harris ultimately removed the guns from the mobile home without a warrant.   At some point between his removal of the guns from the headboard compartment and his departure from the scene, he seized them, implicating the Fourth Amendment.   *See Jacobsen*, 466 U.S. at 113 (defining seizure of property as "some meaningful interference with an individual's possessory interests in that property").   Because Ms. Reynolds generally argued that the seized guns should be suppressed, the Court is tasked with determining whether the warrantless seizure passes muster

under the Fourth Amendment, and, if it does not, whether the exclusionary rule requires that the guns be suppressed.[9]  The Court turns to Ms. Reynolds' claim of unreasonable seizure mindful that "the span of possible searches overlaps, almost perfectly, with the span of possible seizures in the extent to which they, respectively, may or may not infringe upon [F]ourth [A]mendment interests."  *United States v. Cardona*, 903 F.2d 60, 64 (1st Cir. 1990).

### 1. Validity of Warrantless Seizures under the Fourth Amendment

Like a search, a seizure of personal property is "*per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized."  *United States v. Place*, 462 U.S. 696, 701 (1983).  The *per se* rule does not apply, however, if "the police can show that [the seizure] falls within one of a carefully defined set of exceptions [to the warrant requirement] based on the presence of 'exigent circumstances,'" or the plain view doctrine.  *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 474-75 (1971).

In this Circuit, the test for determining exigent circumstances "is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant."  *United States v. Almonte*, 952 F.2d 20, 22 (1st Cir. 1991) (internal quotation omitted).  For example, "[a]n officer's *reasonable* belief that the delay needed to obtain a warrant would pose 'a threat to police or the public safety' is sufficient to create exigent circumstances."  *Fletcher v.*

---

[9] Ms. Reynolds' arguments relating to Officer Harris' seizure of the guns are somewhat opaque.  Her primary argument, that Officer Harris' removal of the guns from their compartment was unlawful, is based on her claim that she did not consent to his search.  *See Def.'s Mot.* at 4-6.  She then offers what appears at first blush to be an alternative argument that would presumably apply in the event the Court concludes that she did consent and the search was reasonable.  She contends Officer Harris' removal of the guns cannot be justified by his safety concerns.  *Id.* at 4 (listing various alternative courses of action that would have preserved officer safety without violating Ms. Reynolds' constitutional rights).  But, according to this alternative argument, Officer Harris should have pursued the enumerated alternative courses of action *before* the guns were in plain view.  *Id.*  The Court has already concluded that Officer Harris reasonably exposed the guns to plain view pursuant to a consensual search.  In light of this conclusion, the Court cannot—without assistance or resort to its own imagination—determine the import of Ms. Reynolds' officer safety argument.

*Town of Clinton*, 196 F.3d 41, 49 (1st Cir. 1999) (emphasis in original) (quoting *United States v. Curzi*, 867 F.2d 36, 42 (1st Cir. 1989)). The "'standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present.'"[10] *Id.* (quoting *Roy v. Inhabitants of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994)). Analysis of exigent circumstances is fact intensive; after all, the "exceptions—by their very nature—turn upon the objective reasonableness of *ad hoc*, fact-specific assessments contemporaneously made by government agents in light of the developing circumstances at the scene." *McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 545 (1st Cir. 1996).

In addition to the exigent circumstances exception, the plain view doctrine allows for warrantless seizure of property under limited circumstances. *Coolidge*, 403 U.S. at 465-66; *United States v. Jones*, 187 F.3d 210, 219 (1st Cir. 1999). As the First Circuit has explained, the plain view doctrine allows a seizure where "(1) the seizing police officer lawfully reached the position from which he could see the item in plain view; (2) the seizure satisfied the probable cause standard; and (3) the seizing officer had a lawful right of access to the object itself." *United States v. Antrim*, 389 F.3d 276, 283 (1st Cir. 2004) (internal quotation omitted).

Although exigent circumstances and the plain view doctrine allow for warrantless seizures of personal property, neither dispenses with the probable cause requirement. *Id.*; *United States v. Khounsavanh*, 113 F.3d 279, 283 (1st Cir. 1997) (noting that the requirement of probable cause "is rigorously adhered to" (citing *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987))). The First Circuit has stated that:

---

[10] The First Circuit once enumerated commonly occurring exigent circumstances: "(1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to [an occupant]." *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995) (alteration in original) (internal quotation omitted).

> [p]robable cause to support a plain view seizure requires more than hunch, guesswork, and cop-on-the-beat intuition, but less than proof beyond a reasonable doubt or a near certainty that the seized item is incriminating.  There must be enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime.

*United States v. Giannetta*, 909 F.2d 571, 579 (1st Cir. 1990) (citations and internal quotation omitted); *see Warden v. Hayden*, 387 U.S. 294, 309-10 (1967) (abolishing distinction between evidence of crime and contraband, fruits, and instrumentalities of crime, and noting that all are subject to seizure).

### 2.    The Government's Justifications for the Warrantless Seizure

The Government makes two points with respect to seizure.  First, it argues that Ms. Reynolds's guns "were legally seized and examined pursuant to consent."  *Gov't's Resp.* at 1. The Court is not convinced.  The Fourth Amendment prohibitions against unreasonable searches and seizures safeguard different interests.  *Segura*, 468 U.S. at 806.  Therefore, it does not follow from the Court's conclusion that Ms. Reynolds consented to the search that she also consented to the seizure.  In fact, according to Officer Harris, she explicitly objected to the seizure.  She protested that he could not take the guns because she was practicing to become a deputy sheriff. Under these circumstances, the Court does not agree that consent serves as an exception to both the warrant and probable cause requirements with respect to the seizure of the guns.

The Government also claims that the police may seize "any *evidence* uncovered" during a consensual search.  *Gov't's Resp.* at 5 (emphasis added) (citing *Schneckloth*, 412 U.S. at 219). This may be true as a general proposition, but the Government does not explain what crime, if any, Officer Harris thought Ms. Reynolds' guns were evidence of when he first removed them from the headboard compartment.  In other words, the Government fails to demonstrate that Ms. Reynolds' guns were subject to seizure under the plain view doctrine at the moment Officer

15

Harris removed them from the headboard compartment.[11]   However, this failure is only relevant if a Fourth Amendment seizure occurred at that moment and the circumstances rendered that seizure unreasonable.  *See Tower v. Leslie-Brown*, 326 F.3d 290, 297 (1st Cir. 2003).

For her part, Ms. Reynolds does not argue that the guns were seized the moment Officer Harris removed them from the headboard compartment.  Nor does she argue as a general matter that they were seized without probable cause.  Indeed, in setting up her argument that the subsequent forensic testing of the guns constituted an unreasonable search, she states:  "That the officer seized the weapons based upon apparent probable cause to believe it was [sic] evidence of the crime of unlawful possession does not justify the later warrantless search of the weapons." *Def.'s Mot.* at 5.  Given the lacunae in the parties' respective memoranda, out of an abundance of caution, the Court determines that Officer Harris' seizure of the guns was reasonable and did not violate the Fourth Amendment, regardless of when it occurred.

    3.        **Analysis of the Warrantless Seizure**

        a.        **The Seizure Was Reasonable if it Occurred When the Guns Were Removed from the Headboard Compartment**

---

[11] The problem the Government faces here is that Officer Harris and his companion did not know Ms. Reynolds' possession of the guns was unlawful under 18 U.S.C. § 922(g)(4) until Officer Harris called dispatch and learned that she had been "blue-papered" several weeks before.  Nor did they know that the serial number on one of the guns had been obliterated, rendering it unlawful for anyone to possess under 18 U.S.C. § 922(k).  Information acquired after seizure of property may not form the basis of probable cause for that seizure.  *See Jacobsen*, 466 U.S. at 115 ("The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred."); *United States v. Bizier*, 111 F.3d 214, 217 (1st Cir. 1997) (applying this principle to information acquired after an arrest).  Cases that approve of plain view seizures of firearms are generally based on determinations that probable cause existed, at the time of the seizure, to believe the firearm was an instrumentality of crime or connected with criminal activity, or that the person who possessed the firearm was a prohibited person under federal law.  *See United States v. Antrim*, 389 F.3d 276, 283 (1st Cir. 2004) (seizure upheld because gun was found during search for evidence of heroin trafficking pursuant to a warrant); *United States v. Coraine*, 198 F.3d 306, 307-08, 310 & n.5 (1st Cir. 1999) (seizure of several firearms upheld because defendant, whose house police consensually searched for evidence of illegal gaming activity, was a convicted felon); *United States v. Smith*, 899 F.2d 116, 117-18 (1st Cir. 1990) (seizure of several firearms upheld because one officer, who along with others searched defendant's apartment for drugs pursuant to a warrant, knew defendant was a felon and that federal law prohibited him from possessing firearms); *United States v. Friel*, 448 F. Supp. 2d 222, 227 (D. Me. 2006) (seizure of gun found during search for drugs pursuant to a warrant upheld because officers knew defendant was a felon and gun was evidence of the crime of unlawful possession).

Officer Harris could not remember exactly what he did with the guns after he removed them from the headboard compartment; he might have handed them to his companion, who was also in Ms. Reynolds' bedroom.  At any rate, he explained that he secured the guns because he was concerned for officer safety.  Assuming Officer Harris' actions constituted a seizure because he meaningfully interfered with Ms. Reynolds' possessory interests in the guns, that seizure was reasonable under the Fourth Amendment.

The Supreme Court has indicated that the plain view exception permits the warrantless seizure of "objects dangerous in themselves."  *Coolidge*, 403 U.S. at 472.  The Court has also observed that an officer may conduct a limited protective search for concealed weapons and neutralize the threat of physical harm during an investigative stop when he "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others."  *Terry v. Ohio*, 392 U.S. 1, 24 (1968).  In *Adams v. Williams*, the Court explained that "[t]he purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law."  407 U.S. 143, 146 (1972); *United States v. Campa*, 234 F.3d 733, 737-38 (1st Cir. 2000).

In *United States v. Bishop*, the Court of Appeals for the Sixth Circuit synthesized *Coolidge* and *Terry* and held that "a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety."  338 F.3d 623, 628 (6th Cir. 2003).  In *Bishop*, an officer went to a residence in a rural area to serve an arrest warrant on a theft suspect.  *Id.* at 625.  On his approach to the suspect's home, the

officer observed Bishop, a person he knew had a reputation for violent behavior, sitting in a car in the driveway.  *Id.*  After learning the suspect was not at home, the officer retraced his steps; this time, the car in the driveway was unoccupied, and a handgun, half hidden by a cushion on the driver's seat, was visible through an open window.  *Id.*  The officer removed the gun because he was concerned for his safety, determined it was loaded, and discovered that there was an outstanding warrant for Bishop's arrest.  *Id.*  Bishop was later charged with being a felon in possession of a firearm, and, after the district court suppressed the gun, the Sixth Circuit reversed.  The appeals court based its approval of the seizure both on the officer's safety concerns under *Terry*, and on the fact that the gun was contraband because it was loaded and left in an unattended vehicle in violation of state law.  *Id.* at 628-29.

Other appellate courts have approved of plain view seizures of weapons under either the *Coolidge* rationale, the *Terry* rationale, or, like the Sixth Circuit in *Bishop*, a combination of the two.  *See United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (stating that an officer conducting a traffic stop "may seize any contraband, including weapons, in plain view" (citing *Michigan v. Long*, 463 U.S. 1032, 1049 (1983))); *United States v. Tellez*, No. 94-10573, 1995 U.S. App. LEXIS 36964, at *3 (9th Cir. Dec. 14, 1995) ("Law enforcement officers may seize any weapon that is in plain view to protect themselves from injury."); *United States v. Robinson*, 756 F.2d 56, 60 (8th Cir. 1985) (concluding that temporary seizure of handgun found in plain view was a reasonable precaution for safety of persons on premises; when officers learned of prior conviction, handgun became subject to seizure as illegal weapon possessed by felon); *see also* Wayne R. LaFave, 3 *Search and Seizure* § 7.5(b), at 677 n.28 (4th ed. 2004) (citing *Bishop*).

In light of this authority, the Court concludes that Officer Harris' temporary seizure of the guns was reasonable, and did not violate Ms. Reynolds' rights guaranteed by the Fourth

18

Amendment.  Officer Harris exposed the guns to plain view in the course of a consensual search. He was entitled not to believe Mr. Bradford that the guns were unloaded, and was further entitled to suspect that his safety would be needlessly jeopardized if he were to turn his back on Ms. Reynolds with the guns close at hand.  By temporarily seizing the guns, he assured that the remainder of his investigation into Ms. Reynolds' background could be conducted under peaceful circumstances.  *See Adams*, 407 U.S. at 146.  If a Fourth Amendment seizure occurred at that moment, it was not an unreasonable one.

> **b.**     **The Seizure Was Reasonable if it Occurred When the Guns Were Ultimately Removed from the Premises**

By the time Officer Harris departed the premises with the guns in his possession and control, he knew that Ms. Reynolds had been "blue papered" and that it was unlawful for her to possess the guns.  This ultimate seizure satisfies the First Circuit's test for a lawful plain view seizure:  By virtue of Ms. Reynolds consent, Officer Harris lawfully reached the position from which he could see the guns and had a lawful right of access to the guns.  Further, based on her response to his request for identification, he had developed probable cause to believe the guns were evidence of the crime of unlawful possession by the time of the ultimate seizure.  *See Antrim*, 389 F.3d at 283; *Giannetta*, 909 F.2d at 579; s*ee also Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.").   Therefore, the seizure was reasonable and did not violate Ms. Reynolds' rights guaranteed by the Fourth Amendment.

> **D.**     **The Warrantless Forensic Testing**

Ms. Reynolds finally contends that even if the Court concludes that the search of her bedroom and seizure of the guns was reasonable, the subsequent forensic testing should have been conducted pursuant to a warrant.  The Government disagrees and argues that "[a]n object

lawfully seized may be kept pending trial and may be subject to scientific testing and examination." *Gov't's Resp.* at 9-10.

The Court notes that neither the Government nor Ms. Reynolds introduced any evidence on the testing issue at the suppression hearing.  According to the parties' memoranda, which disclose no controversy over the facts, on May 4, 2006 Augusta police turned over the two guns to federal agents, who examined them to determine their origins, serial numbers, and the details of their make and model.  *Id.* at 3-4.  In the course of this investigation, the agents discovered that the serial number on one of the guns was obliterated, and, by magnetic and chemical analysis, the agents were able to determine the weapon's precise serial number.  The agents also discovered that neither gun was manufactured in Maine, but both had been purchased from Maine retail stores in the 1980s.

As the Government points out, Ms. Reynolds cites no authority for the proposition that police must obtain a search warrant before conducting forensic tests on evidence of crime lawfully seized pursuant to the plain view doctrine.  In the Court's view, however, Ms. Reynolds' position suffers from a greater infirmity—she assumes the forensic testing constituted a search under the Fourth Amendment.  It is well settled that "[b]efore embarking upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized." *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988).  In resolving the expectation question, courts apply a two-part test, which involves "first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." *United States v. Rheault*, No. 06-1978, 2009 U.S. App. LEXIS 6484, at *9 (1st Cir. Mar. 27, 2009).  Several courts have observed that

viewing and recording a serial number on a firearm lawfully possessed by police is not a Fourth Amendment search because such conduct does not compromise a privacy expectation that our society is prepared to consider reasonable.  *See, e.g.*, *United States v. Menon*, 24 F.3d 550, 563 (3d Cir. 1994); *United States v. Kinney*, 953 F.2d 863, 866 (4th Cir. 1992); *United States v. Walsh*, 791 F.2d 811, 816 (10th Cir. 1986).  These courts generally analogize to the Supreme Court's statement in *Jacobsen* that "[a] chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy."  466 U.S. at 123.  As the Third Circuit noted in *Menon*, typical application of the *Jacobsen* principle "will be the revelation of serial numbers on a gun which require a database to identify but which reveal no information beyond whether the gun is legal or illegal."  *Menon*, 24 F.3d at 563.

Here, it is true that the serial number was not in plain view but was instead obliterated, requiring magnetic and chemical analysis to divine.  In the Court's view, however, *Jacobsen* applies nonetheless.  Forensic analysis revealed the serial number of the firearm, which had previously been exposed to plain view and in which no one has a reasonable expectation of privacy.  Obliteration of a serial number, which itself is evidence of a crime under 18 U.S.C. § 922(k), does not make a Fourth Amendment difference, especially when the federal agents already had probable cause to believe that Ms. Reynolds could not legally possess either firearm.

Further, even if the forensic analysis was a search, the federal agents already were lawfully in possession of the firearms and were treating them as items of evidence.  As the Government notes, the Supreme Court held in *United States v. Edwards*, 415 U.S. 800, 801-04 (1974), that police may seize an arrestee's clothing and search it for evidence of crime without first obtaining a warrant.  Even though *Edwards* was decided pursuant to the search incident to lawful arrest exception to the warrant requirement, *Edwards*, 415 U.S. at 802-03, the *Edwards*

principle applies with equal force where officers lawfully obtained an item of evidentiary value pursuant to the plain view exception to the warrant requirement.  An item of evidence is an item of evidence, and once an "item is held as evidence, it can be retained even after the defendant gains his release and can be subjected to such examination or tests as will confirm or enhance its evidentiary value."  LaFave § 5.3(b) n.73 (discussing *Edwards*).[12]

## III.   CONCLUSION

The Court DENIES the Defendant's Motion to Suppress (Docket # 26).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 21st day of April, 2009

---

[12] In *Arizona v. Hicks*, the Supreme Court observed that "[i]t would be absurd to say that an object could lawfully be seized and taken from the premises, but could not be moved for closer examination."  480 U.S. 321, 326 (1987).  In essence, this is exactly what Ms. Reynolds is inviting the Court to say—that even if it was lawful for Officer Harris to seize the guns, it was still unlawful for federal agents later to search for and discover the serial number that had been obliterated.  "Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken."  *United States v. Lester*, 647 F.2d 869, 875 (8th Cir. 1981).  From the Court's perspective, once any objection based on the transfer of custody is obviated, Ms. Reynolds' argument, based on a claim of a privacy expectation in the serial number, must fail.